KAPLAN HECKER & FINK LLP

350 FIFTH AVENUE | 63RD FLOOR
NEW YORK, NEW YORK 10118

1050 K STREET NW | SUITE 1040
WASHINGTON, DC 20001

TEL (212) 763-0883 | FAX (212) 564-0883

WWW.KAPLANHECKER.COM

DIRECT DIAL      212.763.0884
DIRECT EMAIL    scrowley@kaplanhecker.com

February 2, 2023

**BY ECF**

The Honorable Naomi Reice Buchwald
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street, New York, NY 10007-1312

  Re:  *United States v. Gina Zhou,* 1:20-cr-00402-NRB-2

Dear Judge Buchwald:

  We represent Gina Zhou, who is scheduled to be sentenced by Your Honor on February 16, 2023.[1] On December 1, 2022, pursuant to a plea agreement with the government, Ms. Zhou pleaded guilty to one count of conspiring to violate the Foreign Corrupt Practices Act (the "FCPA") in violation of 18 U.S.C. § 371. Ms. Zhou's involvement in the offense arose from her work as secretary and translator for her co-defendant Cary Yan, a businessman who offered her the opportunity to provide assistance to developing countries. As part of that work, Ms. Zhou assisted Mr. Yan's efforts to pass legislation in the Republic of the Marshall Islands ("RMI"), including by helping to provide payments to RMI legislators in exchange for their support of the legislation. An otherwise law-abiding citizen and devoted daughter to her aging parents, Ms. Zhou deeply regrets the pain her actions have caused her family and the damage her mistakes have caused to her otherwise bright future. *See* Letter of Gina Zhou, Exhibit ("Ex.") A at 1.

  Ms. Zhou's plea agreement with the government includes a stipulated advisory sentencing range under the U.S. Sentencing Guidelines (the "Guidelines") of 37 to 46 months' imprisonment, which is also the Guidelines range calculated in the Probation Department's Presentence Investigation Report ("PSR"). Notably, Probation recommends a below-guidelines sentence of 24 months in prison.

  Ms. Zhou was arrested in Thailand on November 16, 2020, and will have been incarcerated for 27 months at the time of her sentencing. This includes 21 months in brutal and desperate conditions in a notorious Thai prison at the height of the COVID pandemic, where she was prevented from seeing or speaking to her parents (or anybody else outside the prison walls) for

---

[1] At our request, Your Honor expedited Ms. Zhou's sentencing so that her parents could attend before they are required to return to China pursuant to their visas. Ms. Zhou is grateful to the Court for that consideration, and to the government and Probation for their expeditious efforts in accommodating Ms. Zhou's request.

months at a time due to severe forms of "lockdown." As set forth herein, given Ms. Zhou's personal history, her involvement in the offense, the certainty of her post-release deportation, and in particular the incredibly harsh conditions of confinement she endured prior to her extradition, we submit that a sentence of time-served is appropriate and sufficient to meet all of the purposes of sentencing.

### I. The Guidelines Calculations and the PSR

We agree with the Guidelines range that is calculated in the PSR. Specifically, we agree that the applicable offense level is 21 and that Ms. Zhou is in criminal history category I, given her lack of prior criminal history. Therefore, we agree that the Guidelines range is 37 to 46 months.

We object to the PSR in one respect. It states that "Cary Yan and Gina Zhou were issued RMI passports in 2012 and 2015, respectively. . . . The Government has some concern that their passports may have been fraudulently obtained, but the documents themselves are authentic." PSR ¶ 17. In fact, Ms. Zhou originally received her RMI passport in 1996, when she was nine years old, not in 2015. She lawfully renewed her passport in 2015.

### II. Background

#### a. Ms. Zhou's Background

##### i. Family Background & Early Life

Gina was born in Zhejiang Province in China on December 1, 1987. PSR ¶ 62. She was her parents' only child due to China's one-child policy, *id.* ¶ 63, and they were a tight knit family from the start. Her parents worked full time—her father a businessman at Kodak and her mother a kindergarten teacher and later camera shop owner—so Gina became independent from a young age. As her father, Zhou Feng An, notes in his letter to the Court, when Gina was just six years old she could "already cook and prepare some simple dishes by herself." Letter of Zhou Feng An, Ex. B at 1. Gina used her skills to help her parents; according to her mother, Fengling Yu, Gina "would cook a whole meal for us after school when she was only 8 years old. Her story was once in our local newspaper. The title of the news was: Full time parents' child becomes the master of the house." Letter of Fengling Yu, Ex. C at 1.

A theme that shines throughout the letters of support for Gina, and from counsel's personal experience with her, is how deeply kind she is—a trait that she appears to have had throughout her life: As a young girl, Gina would sit in her mother's camera shop and greet customers who visited the store to see her friendly face. *Id.* Her cousin Gu Xinyue notes that as children, when Gu wanted to skip activities or call in sick, Gina would come to her home to pick her up for class and encourage her so she "had no excuse to lay on the bed." Letter of Gu Xinyue, Ex. D at 1. As described in more detail below, this kindness would prove necessary to help Gina survive the brutal conditions of the Thai prison, where even in that harsh environment she helped comfort others and, according to a fellow inmate, share her meager possessions and "sen[d] care and warmth to many elderly people in the prison." Letter of He Tengyue, Ex. E.

This kindness could be taken advantage of, however, prodded on by Gina's naivete. Gina's mother writes of an instance in which a man once approached Gina on the street and said that he

had just been in a bad accident and he needed to borrow her phone and take it with him to find a local friend. Ex. C at 1. Gina agreed, lent him the phone, and never saw it again. Her mother explains: "We never blamed Gina because the mistake came from her kindness." *Id.* at 2.

From the start, Gina was an excellent student and a source of great pride for her parents. She describes herself as not particularly smart or talented, but someone who worked hard and diligently. Beginning in middle school, she attended boarding schools, but made sure to visit her parents at least once per week. Her father notes that she was "studious and curious about new things" and always completed her assignments without any prodding from her parents or teachers. Ex. B. at 1. Because of her efforts, she was an A-student who was regularly rated a "merits student" and "student of excellence." *Id.*

Gina's independence came with a bit of a rebellious spirit as well; she always dreamt of leaving China, traveling the world, and making her mark. At Hangzhou No. 2 High School, she was heavily engaged in extracurricular activities, particularly student unions and the school's TV station. PSR ¶ 64. As she notes in her letter to the Court, this afforded Gina opportunities to meet people with different perspectives and fueled her desires to see more of the world. Ex. A at 1. She also began part-time employment in high school, especially during the summers when she worked at a local department store selling jackets, which she proudly says she was quite good at. PSR ¶ 64.

    ii. <u>College and Graduate School</u>

In 2005, Gina began attending a Chinese university, Zhejiang University of Technology, where she studied Pharmacy. PSR ¶ 80. While at the university, she remained active in outside programs and student unions, as well as arranging activities for other students, including sporting events. She also engaged in volunteer activities with local newspapers and worked with the elderly. She formed a team to participate in her province's "Start-up Competition," and won third place; she was the youngest member of her team.

Gina graduated from her university with stellar grades, in the top five of her class. PSR ¶ 80. She was admitted to one of the top three graduate schools in China for her program. However, prior to beginning her master's program, she took a trip to the United States. As she notes in her letter to the Court, she "fell in love with this country the moment [she] landed." Ex. A at 1. Gina was blown away by the diversity of people and the freedom of movement, and decided to study in the U.S. if at all possible. When she was offered a chance to study at Bowling Green State University ("BGSU") in Ohio with a full scholarship, she leapt at the opportunity. PSR ¶ 81.

Matriculating to BGSU in 2011, Gina studied Applied Statistics and Operational Research, a type of data analytics that was part of the business school. PSR ¶ 81. Though she missed her parents greatly, she loved the ability to form bonds with new people from various backgrounds. She graduated from the program with her master's degree in 2013. *Id.*

    iii. <u>Ms. Zhou's Working Life</u>

Though she enjoyed her master's program, after she graduated, Gina felt somewhat lost. She was not sure she was yet ready to settle down with an office job. So, with the help of a friend,

she moved to San Francisco and began teaching English at two tutoring centers, Think Tank Learning and Kumon Learning Center. PSR ¶¶ 85-86. She tutored immigrants like herself, most of whom were in high school, and found the experience rewarding. While in the Bay Area, Gina's parents—who had worked hard to provide Gina with opportunities they never had—helped her buy a house, and later a second one as an investment property.

Then, in 2014, Gina met Cary Yan. Mr. Yan was 16 years her senior, 43 to Gina's 27, and appeared to be a successful businessman. He told Gina that he planned to travel the world, to meet with other businesspeople as well as government officials to discuss a variety of projects aimed at helping the poor. He expressed that he was in need of a translator and wanted to hire her. To Gina, this sounded "big"; she saw in this opportunity a chance at travel, excitement, and to finally make her mark on the world. Mr. Yan presented his work as for the greater good; the goal was to assist the poor and underserved through dynamic business and governmental strategies. Gina was excited to get started.

Through her work with Mr. Yan, Gina traveled, both around the Bay Area and to foreign countries like El Salvador, Honduras and others, meeting with business and governmental leaders. Gina found the work rewarding and exciting—she was glad to have the opportunity to experience new cultures, meet new people, and try to help give back to the world, even if it was as Mr. Yan's assistant. Mr. Yan, as well as his business partners, would at times ask Gina to help them with ministerial tasks like registering businesses in the United States. When she could, Gina would oblige.

### b. Nature and Circumstances of the Offense

One project that Mr. Yan was particularly keen on developing was a business strategy in the RMI, a small island country in the Pacific Ocean. The RMI included an area called the Rongelap Atoll. In the 1940s and 50s, the United States evacuated the islanders of the Atoll in order to test several hydrogen bombs.[2] This had a devastating effect on the populations of the area, which have since only sparsely repopulated.[3]

In 2015, Mr. Yan had met the mayor of the Rongelap Atoll, who had proposed several projects in which he wanted Mr. Yan to invest. This included a program that aimed at helping workers receive advances on paychecks on a daily, rather than bi-weekly, basis. The mayor also discussed with Mr. Yan the idea of turning the Rongelap Atoll into a special economic zone, similar to Hong Kong. The concept was that the government would grant incentives to companies, like low taxes, easy immigration visas, and working permits to attract businesses to the area. This birthed the legislative proposal of an entity to be called the Rongelap Atoll Special Administrative Region, or "RASAR." It would be a self-governing, semi-independent area within the RMI.

By coincidence, Gina's grandfather had helped Gina obtain citizenship in the RMI when she was nine years old, as he believed it would be useful for her to have secondary citizenship, and

---

[2] Hart Rapaport, *The U.S. Must Take Responsibility for Nuclear Fallout in the Marshall Islands*, SCI. AM. (Apr. 4, 2022), https://www.scientificamerican.com/article/the-u-s-must-take-responsibility-for-nuclear-fallout-in-the-marshall-islands/.
[3] *Id.*

the RMI allowed for citizenship for Chinese citizens. Mr. Yan and Gina began traveling to the RMI and meeting with business leaders and government officials to discuss RASAR.

Under the aegis of an already existing non-governmental organization—the World Organization of Governance and Competitiveness ("WOGC")—Mr. Yan began lobbying legislators for support of RASAR. Mr. Yan and RMI legislators who supported RASAR met resistance from numerous politicians, including the then-president Hilda Heine. It was through these lobbying efforts that the charged conduct arose. As Mr. Yan stated during the plea proceeding, he "agree[d] with others to bribe Mashallese officials in exchange for their support of RASAR." Dec. 1, 2022 Plea Tr. at 18:19-22, *United States v. Yan*, Case. No. 20-CR-402 (NRB) (S.D.N.Y. Dec. 1, 2022). For her part, and as she acknowledged during her plea colloquy, Gina assisted Mr. Yan's efforts to pay those bribes. *Id*. at 20:7-9. As she stated, she "knew this was wrong, and [] should never have agreed to do it." *Id.* at 20:9-10.

### c. Ms. Zhou's Life Following Her Arrest

#### i. Incarceration in Thailand

Gina was arrested on November 16, 2020 while she was in Thailand. She was taken to a notorious women's prison in Bangkok, the Central Women Correctional Institution (the "Thai Central Prison"). Gina ultimately spent 21 months in the Thai Central Prison before she was extradited to the United States in September 2022. She has spent the last six months at the Metropolitan Detention Center in Brooklyn (the "MDC").

The conditions in the Thai Central Prison were deplorable and inhumane. As a recent report from the International Federation for Human Rights notes, "[f]or more than a decade, UN human rights bodies have expressed concern over prison conditions in Thailand."[4] These conditions were exacerbated by the COVID-19 pandemic, which caused frequent, long-term lockdowns and greater strains on already severely limited prison resources.

#### 1. Overcrowding

Thai prisons are infamously overcrowded, particularly those that house women. No country incarcerates women at a higher rate.[5] According to a recent report from the International Federation for Human Rights, Thailand's prisons have an occupancy level of 118,000 inmates; however, there is an actual prison population of over 264,000 prisoners.[6] The Thai Central Prison where Gina was incarcerated has had occupancy rates as high as 242%.[7] The International Committee of the Red Cross requires the minimum space accommodation for prisoners at 3.4 square meters per person in shared or dormitory accommodations; Thailand, however, has an official requirement of just 2.25 square meters per prisoner, and in reality each female prisoner has

---

[4] *Flawed Models: Implementation of International Standards in Thailand's 'Model' Prisons for Women*, INT'L FED'N FOR HUM. RTS. (Dec. 2019), at 8, https://www.fidh.org/IMG/pdf/thailande744aweb.pdf.
[5] Jacob Baynham, *The Story of Prisoner 5770102414*, CHRISTIAN SCI. MONITOR (June 11, 2017), https://www.csmonitor.com/World/2017/0611/The-story-of-prisoner-5770102414.
[6] *Behind the Walls: A Look at Conditions in Thailand's Prisons After the Coup*, INT'L FED'N FOR HUM. RTS. (Feb. 2017), at 12, https://www.fidh.org/IMG/pdf/rapport_thailand_688a_web.pdf [hereinafter *Behind the Walls Report*].
[7] *Id.* at 19.

5

a mere 1.1 square meters of space, less than a third of the bare minimum acceptable international standard.[8]

This was precisely Gina's experience.  Over 60 women were caged in a single, 50-square-meter cell.  At other times, Gina was in a slightly larger cell with 160 women.  PSR ¶ 73.  In order to sleep in such cramped quarters, Gina and her fellow inmates were forced to sleep on the hard floor with their bodies pressed up against each other and their legs bent and intertwined, even during brutally hot Thai summers, and as skin diseases and COVID-19 raged among them.  *Id.*  During certain periods of even higher overcrowding, space could be reduced to 0.6 square meters per person.  If a prisoner needed to use the bathroom at night, she would have to step on or over all of the women between her and the hole in the ground at the end of the cell that was "open" at night for use as a toilet.  Fluorescent lights were never turned off, badly affecting the inmates' sleep, and there were no windows to see outside.  The smell was rancid.  A diagram of how the women were arranged at night, drawn by Gina, is attached as Exhibit H.  During the day, inmates were forced to sit cross-legged facing one another on the dirty floor.  Because of the lack of space, they were rarely if able ever to straighten or stretch their legs.

2. Filthy Living Conditions

In addition to the overcrowding, the Thai Central Prison's resources for personal hygiene were woefully deficient.[9]  Water for showers was available only in the mornings between 5:30 a.m. and 7:00 a.m.[10]  During that time, all of the women were pressed into a room—or at times, required to shower outside.  They were allowed only one minute and eight bowls of cold water to shower, and soap was rarely provided.

There was also severely limited time to use the toilet.  The toilets were "open" for only two hours in the morning and one hour in the afternoon.  During that time, there were long lines as over 1,000 inmates were required to share 10 toilets in an open space with no privacy.  Outside of that time, water was shut off to the toilets.  When the toilets were clogged, which occurred for months at a time during the COVID lockdowns, women were forced to defecate in a bag and keep it in the room where they slept overnight.  Gina recalls one instance in which the toilet was blocked for more than one month, forcing the inmates to urinate, barefoot, into a hole in the floor.

Compounding the filthy conditions they were forced to endure, female inmates in Thai prisons are provided far fewer sanitary pads than they require.[11]  This comports with Gina's experience.  She was given only about a quarter of the sanitary pads that she needed, requiring her to spend her time in or near the "bathroom" while menstruating.  And during periods in which the prison ran out of supply, Gina was forced to go without completely.

---

[8] *Id.* at 12, 20.
[9] *Id.* at 22.
[10] *Id.*
[11] Nanchanok Wongsamuth, *In Prison, With Periods and No Pads: Life in a Thai Jail*, REUTERS (Nov. 26, 2020), https://www.reuters.com/article/us-thailand-prison-women-trfn/in-prison-with-periods-and-no-pads-life-in-a-thai-jail-idUSKBN2861HT.

6

### 3. Lack of Adequate Medical Care

Prisoners were also deprived of basic medical necessities and care. The Thai Central Prison is not air conditioned and fans were scarce. Temperatures rose above 100 degrees in the summer and Gina and her fellow inmates were regularly covered from head-to-toe in heat rashes and skin infections, which spread easily due to the overcrowding. The ointments they were provided to treat their rashes only inflamed them, causing their skin to itch and become infected.

The squalid conditions and lack of adequate treatment caused Gina long-lasting harm. She still suffers from insomnia, anxiety and depression, as well has hair and memory loss, all stemming from her time at the Thai Central Prison.

### 4. Insufficient Food and Drinking Water

Finally, inmates at the Thai Central Prison were given inadequate food and potable drinking water was scarce.[12] Many women were required to eat on the dirty prison floors. Inmates were allowed only one bottle of water per evening—which spanned 14 hours—and so Gina was frequently dehydrated and thirsty, particularly during the brutally hot summers. These conditions meant a constant battle to stay physically healthy, especially in view of the raging COVID pandemic.

### 5. Loneliness and Loss of Personal Dignity

For Gina, however, worse than the physical depravity was the profound fear and loneliness that ate away at her, which she describes as "mental torment." Gina does not speak Thai, which severely limited her ability to communicate with fellow inmates. Nor was she able to communicate with the prison guards, who forced inmates to lower themselves whenever guards walked past, and kneel if they addressed them.

Gina's contact with the world outside the Central Prison walls was also severely restricted. Due to lockdowns, she was not able to see her parents—who had flown to Thailand immediately after her arrest—for the first six months of her incarceration. Gina's parents stayed in Thailand throughout the entire 21 months she was imprisoned there, renting an apartment near the prison, inquiring from everybody and anybody how they could see their daughter. Though they could not see or visit her, they went to the prison nearly every day and stood outside the gates. As Gina notes in her letter to the Court, they became known as the "Frequent Gate Visitors." Ex. A at 2. For the first six months of her time in the Thai Central Prison, Gina was allowed to send a single, 15-line letter once per week. Even after the initial six-month quarantine, Gina was able to "see" her parents only once per month over a 10-minute video call. Other than those video visits and the infrequent conversations she had with fellow inmates who spoke Chinese, Gina was profoundly alone.

Despite all of this, Gina still managed to make small connections in the Thai Central Prison and share her kindness with others. Two former fellow inmates have written letters on her behalf. He Tengyue notes that Gina was "very good at taking care of me and comforting me," and that

---

[12] *Behind the Walls Report*, *supra* note 6, at 21-23.

7

Gina would "always smile[] at people, making me forget the pain here, but she does not let me see when she is sad." Ex. E at 1.  Liu Shiling writes how one night, while they were all pressed against each other, a middle-aged woman urinated while sleeping, which ended up getting Gina wet.  Letter of Liu Shiling, Ex. F at 1.  The woman was very embarrassed and apologized to Gina, but "[t]o everyone's surprise, Gina wasn't upset or mad.  She comforted the lady and told her do not worry." *Id.*  The next day, Gina found the womanand comforted her; they were "all surprised how kind Gina is." *Id.*

### ii. Zhou Family Health

Gina's living conditions improved after her transfer to the MDC.  However, once in excellent physical and mental health, Gina believes she now suffers from Post-Traumatic Stress Disorder ("PTSD") from the horrific conditions she lived in for nearly two years.  She struggles with depression and anxiety.  She also suffers from chronic knee pain, skin rashes, insomnia, memory loss and hair loss.

Gina's parents are also in declining health.  Her mother is 61 years old.  She has early-stage gastric cancer, along with cysts on her liver and spleen.  She also suffers from heart disease, an ovarian cyst causing inflammation, as well as joint pain caused by gout.  Her father has ankylosing spondylitis, a type of arthritis, as well as angina pectoris, or recurrent chest pain.

Gina's grandparents on her father's side are approximately 90 years old and their health is rapidly deteriorating.  Gina's parents have been unable to see them since Gina's arrest for fear that if they return to China they will not be able to leave again, and thereby miss Gina's sentencing.  After Gina is sentenced, they intend on returning and taking care of their aged parents.

### iii. Life at MDC

As noted above, Gina was brought to the MDC following her extradition in early September 2022.  She has since been a model inmate.  She works in the laundry and received the highest marks for both the quality and quantity of her work as well as her eagerness and ability to work with others.  *See* Ex. I at 1-2.  Her supervising officer writes that Gina is "dependable [and] offers assistance to others in need without being asked; works well with everyone, follows instructions well, [and is] dedicated and a very hard worker.  [She] offers beneficial ideas to improve the departmental operation." *Id.*  In addition, Gina has completed a slew of courses and workshops in an attempt to use her time in custody to better herself.  *See* Ex. J.  This includes workshops related to trauma, health, and self-esteem.  *Id.*  She is also currently taking two classes through a Columbia University program: the U.S. Presidency and The Problem of Slavery in the Age of Revolutions.

### d. Ms. Zhou's Future Plans

Upon her release, Gina understands that she will be deported from the United States.  She plans to rejoin her parents and help care for them as well as her grandparents.  She hopes to find employment with a job related to her master's degree, performing data analytics for a business, and start a new chapter in her life.  As evidenced by her letter to the Court, Gina has, in profound and spiritual ways, learned a lesson that she will never forget.

### III. A Sentence of Time Served Is More Than Sufficient to Satisfy the Goals of Sentencing

Pursuant to Section 3553(a)(1), a sentence must be "sufficient, but not greater than necessary," to provide "just punishment for the offense"; to "protect the public" and "deterrence to criminal conduct"; and to provide "needed educational or vocational, medical care, or other correctional treatment" to the defendant. 18 U.S.C. § 3553(a)(1). Here, a sentence of time served—a modest downward variance given the time Ms. Zhou has already spent incarcerated—is more than sufficient to accomplish these objectives in light of Gina's personal history and characteristics, the nature and circumstances of the offense, the extremely low risk of recidivism, and in particular the highly punitive detention she suffered in Thailand.

#### a. Ms. Zhou's Personal History and Characteristics

Gina's personal history and character support a sentence of time served. She has no criminal history. *See United States v. Johnson*, 2018 WL 1997975, at *5 (E.D.N.Y. Apr. 27, 2018) (noting defendant's "standing as a first time offender" justified a downward variance under § 3553). Equally as important, and as reflected in the letters of support from members of her family and others whose lives she touched, Gina is a kind young woman dedicated to her family and friends, in particular, her parents.

Gina is incredibly grateful for her loving family and the support they have provided her from an early age. In return for that support, Gina was what her mother describes as a "filial" daughter, always there to provide love and affection to her parents. Ex. C. at 1. Her mother stresses that she always "knew how to take care of" her parents. *Id.* That care bled into all aspects of her life. As her father notes, during college, because Gina was local, she was always "willing to take care of every classmate both in life and study"; indeed her classmates called her "big sister." Ex. B at 1. She also remained devoted to her elderly family members. "She often sent pocket money to her grandparents and bought them gifts from time to time. Knowing that her grandfather had a hard time walking, she bought him a three-wheeled scooter so he could get around." *Id.*

As described above, Gina's kindness only deepened in the horrendous conditions at the Thai Central Prison. While her naivete was in part what landed her there, she has learned an enormous amount from this experience. Strikingly, Gina considers herself lucky for the travails that she has gone through, as it has brought her even closer to her parents and to her increasingly strong religious faith. *See* Ex. A at 2. She spends her days working at the laundry in the MDC and helps teach math to inmates preparing for the GED. Perhaps most importantly, she intends to re-dedicate her life to helping her parents and living as a productive and successful member of society. As a bright and kind young woman with a supportive family, she has all the tools and drive necessary to make that happen.

#### b. Nature and Circumstances of the Offense

A modestly below-guidelines sentence of time served would also account for "the nature and circumstances of [Gina's] offense" and "reflect the seriousness of the offense." 18 U.S.C. § 3553(a)(1), (a)(2)(a). As an initial matter, Gina has timely accepted responsibility for her conduct

and expressed deep remorse. She is ashamed of her actions and deeply regrets the pain and anguish she has caused her family and loved ones.

A time-served sentence would also reflect Gina's culpability relative to her co-defendant and to other similarly situated defendants. *First*, as the Probation Department acknowledges in recommending a below-Guidelines sentence of 24 months, Gina was the assistant and translator for Mr. Yan. *See* PSR at 24-25. Gina is far younger than Mr. Yan, had no experience in business or politics prior to becoming his assistant, and could not nor would not have engaged in *any* of the offense conduct were it not for her employ with Mr. Yan. While not seeking to minimize the severity of her conduct, it is plainly wholly aberrant behavior for what has otherwise been Gina's lifetime of law-abiding, largely education-related experience, where she had sought opportunities to learn, grow, and pursue a path of kindness and giving towards others, as she has continued to do even in prison.

*Second*, a slightly below-Guidelines sentence of time served, reflecting her 27 months incarcerated, would effectively place Gina at the *higher end* of sentences FCPA defendants have received, and well above the range of sentences imposed on defendants who had similarly limited roles in charged offenses. According to the FCPA Clearinghouse, operated by faculty at Stanford Law School and the Stanford Graduate School of Business, the average sentence of prison or home confinement for defendants convicted of FCPA charges from 1977 to the present is 28 months.[13] Given Gina has served 27 months, a sentence of time served would be the equivalent of a sentence of 31 months with good time credit, giving her an above-average length of incarceration for an FCPA conviction.

By comparison, far more culpable defendants in this Circuit have been sentenced to terms of imprisonment near or even *below* the amount of time Gina as already served. In 2021, Jose Carlos Grubisich was sentenced to a total of 20 months' imprisonment after pleading guilty to two counts of conspiring to violate the FCPA, where his guideline range was the statutory maximum of 120 months' imprisonment. *See United States v. Grubisich*, 19 Cr. 102 (RJD) (E.D.N.Y. Oct. 25, 2021), Dkt. 102 (Judgment) at 2; *id.*, Dkt. No. 86 (Plea Tr.) at 18, 22-23. The government there asserted that the defendant, a former CEO of a multinational company, participated in a conspiracy "to divert hundreds of millions of dollars . . . into a secret illegal slush fund and to pay bribes to government officials, political parties, and others in Brazil to obtain and retain business." *See id.*, Dkt. No. 97 (Govt. Sent. Br.) at 1. Chi Ping Patrick Ho was sentenced in 2019 to a total of 36 months *after trial* for his role (as characterized by the government) as the orchestrator of two bribery schemes involving the governments of Chad and Uganda, despite a Guidelines range of 262 to 327 months and bribes totaling over $2.5 million. *United States v. Ho*, 17 Cr. 779 (LAP) (S.D.N.Y. Mar. 25, 2019), Dkt. No. 230 (Sent. Tr.) at 19, 22, 24. Here, of course, Gina was not in any sense the leader or originator of any of the conduct described in the Indictment, was involved in an FCPA conspiracy involving a far smaller dollar amount, and unlike Ho, chose to plead guilty and accept responsibility shortly after arriving in this country.

---

[13] *See* Stanford Law School, *Foreign Corrupt Practices Act Clearinghouse*, available at https://fcpa.stanford.edu/statistics-keys.html (last visited Feb. 2, 2023).

Indeed, courts regularly take into account a defendant's lesser role in an FCPA conspiracy in imposing more lenient sentences than Gina's already-served 27 months, even where they have not received minor role guideline reductions. In *United States v. Bourke*, 05 Cr. 518 (SAS) (S.D.N.Y. Nov. 10, 2009), for example, the defendant was convicted after trial of conspiring to violate the FCPA with a calculated loss amount at $11 million and a guideline range of 57 to 71 months. *Id.*, Dkt. No. 262 (Sent. Tr.) at 17:2-24 (attached as Exhibit K). In imposing a 12-month sentence, Judge Scheindlin noted, "First, *and perhaps most important*, this defendant was in no way the originator of this scheme. . . . He went along with th[e] plan and furthered its goals." *Id.* at 32:25-33:8 (emphasis added). Similarly, in *United States v. Barnett*, the court imposed below-Guidelines sentences for two defendants who were involved in a bribery scheme at Rolls-Royce that involved nearly $2 million in "corrupt payments" and resulted in a contract of $145 million and $5.4 million profit. *See* 16 Cr. 248 (EAS) (S.D. Ohio. July 24, 2019), Dkt. No. 37 (Sent. Tr.) at 26:8-12. While the fact that one defendant cooperated contributed to the court's decision to impose a non-incarceratory sentence of six months' home confinement, the court also noted that its decision to vary downward was based in part on the fact that the defendant was "not the instigator," and, while he played a "mid level role" in the scheme, "did not plan" or conceive of it. *Id.* at 26-30. His subordinate, who played a "minor role in the whole scheme," and was "directed by supervisors," received a term of probation of five years. *See United States v. Zuurhout*, 17 Cr. 122 (EAS) (S.D. Ohio July 25, 2019), Dkt. No. 39 (Sent. Tr.) at 19-20, 22; *see also United States v. Lukas*, 08 Cr. 522 (E.D. Pa. Sept. 15, 2010), Dkt. No 205 (Judgment) at 2 (receiving sentence of two years' probation with respect to FCPA conspiracy driven by his co-defendant); *United States v. Salvoch*, 10 Cr. 20893 (PCH) (S.D. Fla. June 6, 2012), Dkt. No. 63 (Sent. Tr.) at 40-41 (where guideline sentence was statutory maximum of 60 months, receiving 10 months imprisonment in part because defendant was not driver of scheme but rather had "a lot of pressures on him").

There is no dispute that Gina was not a leader or instigator of the conspiracy charged in this case. She was Mr. Yan's much younger translator and assistant. Without minimizing Gina's knowledge that what she did was wrong, it is important to emphasize that she neither conceived of nor drove the ischeme—indeed, prior to her work with Mr. Yan, she had no experience in lobbying legislative proposals, or meeting with government officials. She did not receive any monetary benefits from her efforts to pass the RASAR legislation, and no one suffered pecuniary harm. A time served sentence is more than sufficient to reflect Gina's relative culpability and the role she played in the conduct charged in the Indictment.

### c. Ms. Zhou's Punitive Detention at the Thai Central Prison Eliminates the Need for Further Incarceration

In light of the circumstances of Gina's detention since her arrest in November 2020, a sentence of time served provides just punishment for Gina's offenses. 18 U.S.C. § 3553(a)(2)(A). As set forth in detail above, the conditions of Gina's detention since her arrest have been severely punitive and render a sentence involving any additional prison time excessive. Indeed, the "horrific conditions she experienced in the Thailand jail" were a key factor in Probation's decision to recommend a downward variance. *See* PSR at 25.

11

Courts in this District, including this one, have regularly granted downward variances in consideration of harsh conditions of confinement in foreign prisons, including prisons in Thailand. Your Honor recently sentenced Manuel Monroy, who faced a Guidelines sentence of 168 to 210 months' imprisonment, to 33 months based on the "physical conditions in Colombia where he spent 18 months as well as the extra strain presented by being in custody during a pandemic." *United States v. Monroy*, 19 Cr. 518 (NRB) (S.D.N.Y. Aug. 9, 2022), Dkt. No. 58 (Sent. Tr.) at 12; *see also United States v. Sanpedro*, 352 F. App'x 482, 486 (2d Cir. 2009) (noting that "in imposing the sentence it did, the district court considered the harsh conditions of [the defendant's] confinement" in Colombia prior to extradition); *United States v. Soborski*, 13 Cr. 521 (LTS) (S.D.N.Y. Sept. 13, 2016), Dkt. No. 367 (Sent. Tr.) at 41-42 (considering the "harsh[] and injurious" conditions of confinement while defendant was incarcerated in Estonia in issuing below-guidelines sentence); *United States v. Tuzman*, 15 Cr. 536 (PGG) (S.D.N.Y. Sept. 10, 2021) (issuing time-served sentence to defendant in part based on the "suffering he endured in Colombia[n]" prison), Dkt. No. 1216 (Sent. Tr.) at 66-67; *United States v. Salvador*, 2006 WL 2034637, at *4 (S.D.N.Y. July 19, 2006) (holding that defendant's pre-sentence conditions while "incarcerated in the Dominican Republic . . . . including an almost complete lack of even minimal sanitary conditions" warranted a downward departure). And in *United States v. Valkovic*, Judge Carter explicitly considered the fact that "the conditions under which [the defendant] was incarcerated in Thailand were particularly harsh" in imposing a below-Guidelines sentence. 13 Cr. 579 (ALC) (S.D.N.Y. Jan. 15, 2016), Dkt. No. 130 (Sent. Tr.) at 43.

Courts in the Second Circuit have also granted downward variances or reduced sentences based on time spent incarcerated during the COVID pandemic. *See, e.g., United States v. Gonzalez*, 18 Cr. 669 (JPO) (S.D.N.Y. Apr. 2, 2021), Dkt. No. 250 (Sent. Tr.) at 17:17-18:5 (noting that defendant's pre-sentence confinement of 24 months in the MCC during harsh COVID protocols "is equivalent to having served three years"); *United States v. Sepulvelda*, 19 Cr. 229 (PKC) (E.D.N.Y. June 24, 2021), Dkt. No. 81 (Sent. Tr.) at 29:17-30:3 (finding downward variance of 35 months was justified in part because time spent at MDC was "much harsher, and . . . equivalent to much greater punishment" due to COVID protocols); *United States v. Morgan*, 19 Cr. 209 (RMB) (S.D.N.Y. May 8, 2020), Dkt. No. 90 (Sent Tr.) at 37:15-18 (issuing sentence below guidelines in part based on "the conditions of the MDC during this, particularly during this difficult coronavirus time, but also across the board even before the coronavirus erupted"); *United States v. Phillibert*, 15 Cr. 647 (PAE), 557 F. Supp. 3d 456, 461 (S.D.N.Y. Aug. 27, 2021) (granting motion for compassionate release because, "[i]n the Court's judgment, a day spent in prison under extreme lockdown and in well-founded fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison").

Gina was unfortunate enough to face doubly cruel conditions for 21 months: an overcrowded, under-resourced Thai prison during the COVID pandemic. Without repeating the above, Gina lived under ruthless conditions while being deprived of even basic contact with her parents, loved ones, and often her lawyer. Consideration of the harsh prison conditions Gina endured should therefore apply with even greater force here.

Furthermore, the Court should take into account the immigration consequences of Gina's conviction, namely that she will be deported following her sentence. *See, e.g., Valkovic*, Dkt. No. 130 at 43-44 (considering the defendant's post-incarceration deportation in granting downward variance); *see also United States v. Thavaraja*, 740 F.3d 253, 263 (2d Cir. 2014) (in determining sentence, "a district court may take into account the uncertainties presented by the prospect of removal proceedings and the impact deportation will have on the defendant and his family"). Gina has executed a Judicial Removal Order, waiving all of her rights to contest deportation or admissibility to the United States. Gina lived in the United States for several years, built a community and owns a home here; she will no longer have access to any of these things. Her likely permanent exile from the United States further compounds the punishment she has faced for her conduct.

In short, Gina's already served sentence has been more than sufficient to satisfy the goal of just punishment.

### d. Deterring Criminal Conduct and Protecting the Public

A sentence of time served, reflecting Gina's 27 months' incarceration, will undoubtedly protect the public and deter future criminal activity. 18 U.S.C. § 3553(a)(2)(B-C). As an initial matter, Gina's complete lack of any past criminal history makes her likelihood of recidivating low. *See* U.S. Sent. Comm'n, *Recidivism Among Federal Offenders: A Comprehensive Overview*, at 5 (Mar. 2016) ("A federal offender's criminal history [is] closely correlated with . . . . a greater likelihood of recidivism."); *United States v. Cosimi*, 368 F. Supp. 2d 345, 349 (S.D.N.Y. 2005) (noting that defendant's "lack of criminal history," among other things, "indicate[d] that he presents a low danger of recidivism"); *see also United States v. Smith*, 321 F. Supp. 3d 405, 409 (E.D.N.Y. 2018). Indeed, this has been such a universally traumatic experience for her that the chances of her committing any infraction for the rest of her life are vanishingly small.

Moreover, Gina has exhibited genuine remorse for her conduct and devoted herself to a new path upon her release. *See United States v. Rodriguez*, 492 F. Supp. 3d 306, 315 (S.D.N.Y. 2020) (granting sentence reduction based in part on "substantial evidence of [prisoner's] remorse in the letters from those who know him best"); *United States v. Jones*, 2020 WL 6131252, at *2 (S.D.N.Y. Oct. 19, 2020) (noting importance "at the time of sentencing" of "genuine remorse" and "efforts at self-rehabilitation"). Soon after arriving in the United States, Gina asserted her desire to plead guilty, accepted responsibility, and apologized for her actions. Her behavior while incarcerated has exemplified her commitment to leading a law-abiding life, including her work at MDC in the laundry and tutoring others. And as reflected by her and her parents' letters, her plan upon release is to find a job within the field she studied and devote herself to helping her parents and grandparents. Ex. A at 2-3; Ex. B at 3.

Additionally, the punishment Gina has received will provide sufficient general deterrence. Through this case, the U.S. government has demonstrated that even relatively small bribes in distant island countries related to legislation with little connection to the United States can and will be punished. Extending Gina's prison sentence will not add greater weight to that warning. *See, e.g., United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) ("[T]here

is . . . considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders."); *see also* Michael Tonry, *Purposes and Functions of Sentencing*, 34 CRIME & JUST. 1, 28-29 (2006) (noting that "every major survey of the evidence" has found that "increases in severity of punishments do not yield significant (if any) marginal deterrent effects"). Furthermore, the arrest and prosecution of Gina and her co-defendant have been well-publicized,[14] adding to the deterrent effect. *See, e.g., United States v. Munir*, 953 F. Supp. 2d 470, 475 (E.D.N.Y. July 17, 2013) (noting that "[w]hen the press publishes the consequences of law-breaking, the effect of a sentence on general deterrence is enhanced").

Finally, it nearly goes without saying that the public needs no protection from Gina. She is a compassionate and generous young woman who made a serious mistake and paid dearly for it. She will soon be deported from the United States and back in the care of her family, where she will use her master's degree in data analytics to become a contributing member of society. She still has a bright future in front of her, and she is looking forward to getting started on a new path.

\*   \*   \*

Gina is a hard-working, driven, and intelligent woman with a loving family and bright future ahead of her. Though she was on a path to success, she lost her way due to a mix of naivete, wanderlust, and her professional entanglement with Mr. Yan. And as detailed above, she has paid for it. Twenty-one months of her life were spent in unimaginably harrowing conditions, and the subsequent six months at the MDC have been spent keeping her head down, working hard, and processing her trauma. Following her sentence, Gina will be deported from the United States, and she will finally get to reunite with her parents, who have supported and followed her every step of this journey. She looks forward to finding employment in the field of her expertise, supporting her family, and living a law-abiding life. A sentence of time served in light of her 27 months incarcerated is sufficient to achieve the aims of punishment and deterrence, reflective of a higher length of incarceration than that recommended by Probation, and will allow Gina the opportunity to set herself back on the path to success.

Respectfully submitted,

Shawn Crowley
Mark Weiner

---

[14] *See* Jill Goldenziel, *U.S. Must Contain Fallout From Crypto-Zone Scheme on Nuked Pacific Island,* FORBES (Sept. 20, 2022), https://www.forbes.com/sites/jillgoldenziel/2022/09/20/us-must-contain-fallout-from-crypto-zone-scheme-on-nuked-pacific-island/?sh=750144854ce2; Stephen Wright, *Pair Plead Guilty to Bribery in Attempt to Create Semi-Autonomous Pacific Region*, RADIO FREE ASIA (Dec. 5, 2022), https://www.rfa.org/english/news/pacific/bribery-12052022102736.html.

Kaplan Hecker & Fink LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
Facsimile: (212) 564-0883
scrowley@kaplanhecker.com
mweiner@kaplanhecker.com

*Counsel for Defendant Gina Zhou*

cc: AUSA (by ECF)