

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 9, 2023

**BY ECF**
Honorable Naomi Reice Buchwald, U.S.D.J.
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

**Re:** *United States* **v.** *Gina Zhou*, 20 Cr. 402 (NRB)

Dear Judge Buchwald:

      The Government respectfully submits this letter in advance of the sentencing of defendant Gina Zhou. As further discussed below, given Zhou's relative culpability and the harsh conditions of confinement she has endured to date, a time-served sentence of approximately 27 months' imprisonment is appropriate.

      **I.**      **Factual Background**

      **A. The Republic of the Marshall Islands**

      The Republic of the Marshall Islands, or "RMI," is located in the central Pacific Ocean. The nation consists of 29 separate atolls, or island chains. The United States liberated the Marshall Islands from the Japanese Army during the Second World War, and governed them until 1979, when the RMI became an independent nation. The RMI and the United States then entered into a compact of free association that gives the United States responsibility to defend the Marshall Islands and to provide certain government functions (such as postal service), and allows RMI citizens the right to emigrate to and work in the United States. The United States maintains a military base on Kwajalein, the RMI's second most populous island. The RMI uses the U.S. dollar as its currency, and English and Marshallese are its official languages. (PSR ¶ 15).

      The lower house of the RMI legislature (the "Nitijela") holds most of the governing power. The lower house consists of 33 senators, who are democratically elected. The Nitijela can enact legislation and elects the president. The president has significant authority while in office, but can be replaced by a simple majority vote of no confidence in the lower house. (PSR ¶ 16).

      Yan's and Zhou's connection to the RMI predates the primary events of this case. Both hold Marshallese citizenship and passports. Before the events directly at issue here, Yan and Zhou

traveled to the RMI on several occasions, where they met with various locals in connection with proposed business ventures such as a stock exchange located in the RMI. (PSR ¶ 17).

### B. Yan Purchases the WOGC

In 2001, a New York resident (the "Founder") established a non-governmental organization (the "NGO") in Manhattan. The NGO was dedicated to international development, and initially focused on education projects in Ghana. Domestically, the NGO is a 501(c)(3) charity incorporated in New York State. In 2008, the NGO received "consultative status" with the UN's Department of Economic and Social Affairs ("ECOSOC"). Consultative status with ECOSOC is an important credential that allows an NGO access to certain UN events and enhances the NGO's reputation because consultative status indicates that the UN believes the NGO to be legitimate. (*See* PSR ¶ 19 & n.1).

Francis Lorenzo was a deputy ambassador to the UN from the Dominican Republic, who lived in New York City. Lorenzo pled guilty, pursuant to a cooperation agreement, in an unrelated bribery scheme. *See United States v. Ng Lap Seng, et al.*, 15 Cr. 706 (VSB). In 2016, Lorenzo introduced Yan and Zhou to the Founder, at Yan's request. Lorenzo proposed that Yan would replace the Founder as the president of the NGO—with the Founder becoming the vice president—in return for which the Founder would receive a regular salary and Yan would fund the NGO's development work. The Founder accepted the deal. In return for Lorenzo's efforts, Yan transferred $1 million to an investment fund in New York controlled by Lorenzo. (*See* PSR ¶¶ 19-20 & n.1).

In July 2016, Yan and the Founder entered into a formal memorandum of understanding. Under its terms, the NGO changed its name to the World Organization of Governance and Competitiveness ("WOGC"), and Yan became the WOGC president. The Founder made official filings with the UN and New York State Department of State to ensure that WOGC assumed the NGO's status as an NGO with ECOSOC consultative status at the UN, and as a charitable corporation in New York. (*See* PSR ¶ 20).

After July 2016, Yan and Zhou established and intermittently operated from WOGC's Manhattan offices, located at 777 Third Avenue. During that time, the Founder became increasingly disillusioned with Yan and Zhou, who she believed were misusing the NGO for their personal profit, deceiving the UN representatives of various foreign governments through false promises of development projects, and ruining the good reputation the Founder had built for the NGO that she had established. In March 2018, the Founder made unchallenged filings with the UN and New York State, reverting WOGC's name to the NGO's original name and reestablishing herself as the organization's president. Yan and Zhou, however, continued to use the 777 Third Avenue address and the WOGC name in their dealings abroad. (PSR ¶¶ 21-22).

### C. The 2017-2018 Attempt to Create the RASAR

Beginning at least as early as December 2016, Zhou began using her and Yan's association with WOGC in emails arranging meetings with Marshallese officials. (Because Yan does not speak English, Zhou typically corresponded with the Marshallese on his behalf, and acted as an

interpreter during his meetings with English speakers.) Those meetings occurred both in the RMI and in Manhattan. For example, on July 14, 2017, Zhou and Yan met with a Marshallese official twice at the RMI's UN mission in Manhattan. After the second meeting, that official requested that WOGC purchase several international, first class flights for her and her associates to fly to a conference in another Pacific island nation, and Zhou did so. (PSR ¶¶ 18, 23-24).

In 2017, Yan and Zhou met with another Marshallese Official ("Official-1"), who served as the mayor of the Rongelap Atoll, a region of the RMI. Yan and Zhou met with Official-1 both in New York and in the RMI. Yan invested in a private venture run by Official-1, and Official-1 appointed Yan a "special advisor" to the Rongelap Atoll, with duties focused on planning and implementing a special administrative region there—plans that would later become known as the Rongelap Atoll Special Administrative Region (the "RASAR"). (PSR ¶ 25).

In April 2018, WOGC publicly "launched" the RASAR project. The RASAR would be created by legislation that, if enacted by the RMI legislature, would significantly change the laws on the Rongelap Atoll to make the region more hospitable to investment and commerce, including by lowering or eliminating taxation and relaxing immigration regulations. At times, Yan planned to use the RASAR to create one or more casinos in the Rongelap Atoll, as well as to base various online ventures there, including a cryptocurrency business, and to attract investors and customers. (PSR ¶ 26).

WOGC announced the launch of the RASAR initiative at an April 2018 conference it hosted in Hong Kong, but which was planned in significant part from WOGC's Manhattan headquarters. Yan, Zhou, and subordinate members of WOGC attended. Three RMI officials attended the conference, including Official-1. The other two officials ("Official-2" and "Official-3") were members of the RMI legislature. WOGC paid for these officials' travel to Hong Kong, and for their luxury accommodations and entertainment there. WOGC publicly introduced the RASAR proposal, and Official-2 gave a speech praising it. (PSR ¶ 27).

In mid-August 2018, Official-3 and other RMI legislators officially introduced the bill to create the RASAR. From that point through October 2018, Yan and Zhou tried to persuade the RMI legislature to pass the RASAR bill, including through bribery. For example, Yan and Zhou offered an RMI legislator ("Official-5")[1] approximately $10,000 in cash to vote for the RASAR, which Official-5 refused; Yan and Zhou made a similar payment to Official-3, who accepted the bribe; and Zhou made a $22,000 "loan" to another RMI legislator ("Official-4"), on which Official-4 appeared to have made no payments as of June 2020, and which was interest free. In total, the bribes Yan and Zhou paid and attempted to pay to RMI officials in return for their support of the RASAR exceeded $40,000. Yan and Zhou worked hand-in-glove with RMI officials whose support they had won, including Official-1, Official-3, Official-4, and another RMI legislator

---

[1] The labels of the RMI officials are not sequentially numbered here because this memorandum uses the same labels as the Indictment.

("Official-6") who was related to the RMI official for whom WOGC had bought plane tickets in 2017. (*See* PSR ¶¶ 28-30).

Notwithstanding Yan's and Zhou's efforts to bribe supporters, by November 1, 2018, it had become clear that the RMI legislature would not enact the RASAR legislation. Although Yan had significant support from members of the RMI's legislature, he was unable to secure the support of the then-President of the RMI (the "Former President") and her supporters. After the RMI proposal failed, Yan's allies then attempted to have the Former President removed from office through a vote of no confidence. On November 12, 2018, the vote was held, and the Former President's government survived. (PSR ¶ 31).

### D. The Second Attempt to Create the RASAR

After the November 2018 failure of the RASAR, Zhou and Yan remained in touch with their RMI allies. In a December 2018 email, Official-6 promised Yan and Zhou "revenge" against the Former President for her opposition to the RASAR. (PSR ¶ 32).

On November 18, 2019, the RMI held elections for the legislature. The Former President's party lost several seats, and no longer enjoyed a majority. On January 13, 2020, the new RMI legislature elected a new president. In early February 2020, Zhou and Yan began corresponding with their RMI contacts, visiting them in the RMI from approximately February 2 to February 13, 2020, to discuss restarting the RASAR initiative. On February 14, 2020, Yan and Zhou emailed Official-6, promising that if the RASAR passed, Official-6's "family will be one of the most powerful family! [sic]." (PSR¶ 33).

In late February 2020, the legislature began considering a resolution that would endorse the concept of a RASAR, a preliminary step that could allow enacting the more detailed RASAR legislation at a later date. In early March 2020, Yan and Zhou returned to the RMI to attempt to secure passage of the legislation. Zhou began regularly corresponding with Official-1, Official-2, Official-3, Official-4, and Official-6 in order to marshal support for this resolution. (PSR ¶ 34).

On March 7, 2020, Yan and Zhou met with a relative (the "Relative") of Official-3. Zhou recorded this meeting on her iPhone, presumably as potential leverage over Official-3. During the meeting, Yan and Zhou gave the Relative $7,000 to pass on to Official-3, who was to use this cash to bribe other RMI legislators to support the RASAR resolution. Yan and Zhou also stated that they knew that Official-3 needed additional cash for this purpose, and that they would get that money shortly. Yan and Zhou further discussed having previously brought larger sums of cash into the RMI through the United States, implicitly for similar purposes. (PSR ¶ 35).

On March 20, 2020, the RMI legislature passed the resolution. Progress on the ultimate passage of the RASAR appeared to have slowed with the outbreak of the COVID-19 pandemic, and halted when Yan and Zhou were arrested in Thailand on the charges in this case in November 2020. (PSR ¶ 36).

Yan and Zhou chose to contest their extradition to the United States, and because of that choice were incarcerated in Thailand from November 2020 until Thai courts rejected their

Case 1:20-cr-00402-NRB   Document 33   Filed 02/09/23   Page 5 of 6

Page 5

arguments in September 2022. (PSR at 1). Yan and Zhou were then extradited, and have been in custody in the United States since September 2022. (PSR at 1).

On December 1, 2022, Zhou pled guilty to Count One of the Indictment, charging her with conspiracy to violate the Foreign Corrupt Practices Act, pursuant to a plea agreement with the Government. (*See* Dkt. 26). Because Zhou is not a U.S. citizen and has already consented to the entry of a judicial order of removal, she will be deported from the United States upon the completion of the custodial portion of her sentence should this Court execute the proposed order attached to this submission as Exhibit A.

### II. The Guidelines

The parties and the Probation Office agree that Zhou's advisory sentencing range under the United States Sentencing Guidelines (the "Guidelines") is 37 to 46 months' imprisonment. (*See* PSR ¶¶ 93-94; Dkt. 32 (Zhou's sentencing submission, or "Br.") at 1).

### III. Section 3553(a) Analysis

Zhou's crimes were serious: She helped corrupt a Manhattan NGO that had previously done legitimate humanitarian work. She bribed democratically-elected legislators to vote for a bill because it would enrich her boss, not help their constituents. She tried to destabilize a sovereign government, attempting to engineer a no-confidence vote that would oust the RMI's president simply because the president would not support Yan's corrupt scheme. And she tried to usurp power in a U.S.-allied republic, promising a political family that they would become the "most powerful" through their bribe-induced alliance with Yan. (*See* PSR 19-36).

Contrary to her sentencing submission, Zhou's role in Yan's schemes was far from "ministerial." (Br. 4). Zhou acted not only as Yan's personal assistant and translator, but as his deputy. She interacted directly with RMI officials, cajoling, ingratiating, and bribing them to advance the RASAR scheme. She also gave direction to unwitting WOGC employees, such as those in the Manhattan office, on matters such as correspondence with the RMI government and planning and executing the April 2018 conference that launched the RASAR project. In part for those reasons, witnesses described Zhou more as a second-in-command than as a secretary.

Nonetheless, the Government ultimately agrees with Zhou's request for a below-Guidelines sentence of time served for two reasons:

*First*, Zhou is far less culpable than Yan. Although Zhou was much more than a functionary of Yan's, it is nonetheless clear that she was entirely his agent in the conspiracy. Yan controlled the money and the organization necessary to the scheme. Had the scheme succeeded, the profit would have been his, with Zhou's share depending on what Yan chose to pay her. And although Zhou had considerable independence and responsibility in carrying out the scheme, there is no dispute that Yan was the decisionmaker.

*Second*, although Zhou's crimes were serious, she has already received serious punishment. She has already been imprisoned for approximately 27 months as a result of her arrest in this case.

As her submission points out, that is roughly the amount of time she would expect to serve had she received a 31-month federal sentence and credit for good conduct in prison. (Br. 10). Zhou also has offered evidence that her conditions of confinement for the first 21 months of her incarceration were extremely harsh. (Br. 5-7).[2] The Government therefore believes that the significant time Zhou has already served in prison in this case suffices to accomplish the goals of sentencing outlined in 18 U.S.C. § 3553(a).

                        Respectfully submitted,

                        DAMIAN WILLIAMS
                        United States Attorney

by:  s/_____
      Hagan Scotten
      Lara Pomerantz
      Derek Wikstrom
      Assistant United States Attorneys
      (212) 637-2410/2343/1085

      GLENN LEON
      Chief, Fraud Section
      Criminal Division

by:  s/_____
      Anthony Scarpelli
      Trial Attorney
      (202) 616-4988

---

[2] The Federal Bureau of Investigation repeatedly inquired into the conditions of Zhou's incarceration abroad. Although it was unable to confirm Zhou's claims, it also did not uncover evidence that those claims are inaccurate, and the Government thus believes that Zhou's claims about her conditions of confinement should be accepted as true for purposes of this sentencing.